KOLIN GARCIA,

             **Plaintiff,**

-vs-                                     **Case No.  6:08-cv-1245-Orl-31GJK**

DS WATERS OF AMERICA, INC. d/b/a
Crystal Springs,

             **Defendant.**

_____

# ORDER

This matter came before the Court without oral argument upon consideration of Defendant's, DS Waters of America, Inc. ("Defendant"), Motion for Summary Judgement (the "Motion") (Doc. 17), and Plaintiff's, Kolin Garcia ("Plaintiff"), response in opposition thereto (the "Response") (Doc. 22).

## I.  Overview

In his Complaint, Plaintiff alleges that his former employer discriminated against him because of his race and national origin in violation of 42 U.S.C. § 1981 (Doc. 1, ¶¶ 5, 9, and 39). Specifically, Plaintiff alleges that Defendant unlawfully terminated his employment and subjected

him to a hostile work environment.[1]  Defendant has now moved for summary judgment on all

claims asserted in the Complaint (Doc. 17 at 1).

The Court addresses Defendant's Motion, *infra*.  The Court has subject matter jurisdiction

pursuant to 28 U.S.C. § 1331.

## II.  Factual Background

### A.  General

Defendant is a bottled water company that controls the Crystal Springs brand throughout

the State of Florida.  Plaintiff is an Hispanic Cuban-American who was employed by Defendant

from January, 2004 through May, 2008 (Doc. 1, ¶¶ 17 and 23).[2]  In early 2006, as a result of a

company reorganization, Plaintiff became one of Defendant's three Area Managers for the entire

state (Doc. 22-14 at 25-26).  As an Area Manager, Plaintiff's job responsibilities included

supervising more than seventy-five of Defendant's Sales Managers, Mechanics, Route Operations

Managers, and Route Sales Representatives and ensuring that Defendant's profit and loss targets

were met throughout its Central Florida region (including Orlando, Clearwater, Tampa, and

Sarasota) (Doc. 22-14 at 25-26 and 31, Doc. 22-13 at 9-10, and Doc. 17-8 at 29).  After the

company's reorganization, Plaintiff reported directly to Charles Fogg, Defendant's General

---

[1]Although Plaintiff's Complaint contains only a single count that is broadly labeled "Violation
of 42 U.S.C. § 1981" (Doc. 1 at 7), both parties have read the Complaint to assert two separate claims:
(1) an unlawful termination claim; and (2) a hostile work environment claim (*see generally* Docs. 17
and 22).  According to Defendant, Plaintiff also filed a Title VII charge with the EEOC on October
23, 2008 (i.e., nearly three months after he filed the instant suit) (Doc. 17 at 1).  Plaintiff, however,
has never sought leave to amend his Complaint and the charge before the EEOC apparently still
remains pending.

[2]Plaintiff also worked for Defendant's predecessor company in California from approximately
1994 to 2002 (Docs. 1, ¶¶ 10-15, and 17 at 2, n.2).

Manager and Vice-President for the State of Florida and Plaintiff's immediate supervisor (Doc. 22-14 at 26, Doc. 22-13 at 4 and 7, and Doc. 17-8 at 28).

**B. Nature of the Harassment**

Plaintiff testified that, from approximately March, 2006 through his termination in May, 2008 (i.e., from the time when Plaintiff began reporting directly to Mr. Fogg), Mr. Fogg regularly subjected him to inappropriate racial or ethnic harassment (Doc. 22-14 at 72). Specifically, Plaintiff testified that, *inter alia*, Mr. Fogg:

- routinely referred to him as "Paco" both in front of, and outside the presence of, other employees for approximately a one-and-a-half year period (Doc. 22-14 at 67-68 and 72);

- once told Plaintiff while in a meeting with five other employees, "Hey Paco, shouldn't you be out in front of the branch trimming the hedges?" (Doc. 22-14 at 72);

- relayed a joke to Plaintiff in which a Puerto Rican physician is asked why he became a doctor, to which the doctor replies, "because Puerto Ricans are good with knives" (Doc. 22-14 at 73);

- upon seeing a trash can in the hallway, once told Plaintiff  "why is that out there, aren't you the janitor here?" (Doc. 22-14 at 73-74);

- upon learning that the keys to some of Defendants' new company vans were missing, told Plaintiff, in presence of other employees,  "Your last name is Garcia, shouldn't you be able to start it without the keys?" (Doc. 22-14 at 72);

- forwarded an email to Plaintiff and other employees that included the subject line "Labor market in 2009" and a video attachment depicting an Hispanic man standing in the back of a pickup truck who was in charge of surveying a group of men dressed in suits and carrying brief cases that were looking for work in the same manner day laborers putatively would look for work (Doc. 22-14 at 68-69); and

- Laughed at and later displayed in his office a company calendar that was prepared by his employees which included a picture of Plaintiff wearing a straw hat, below which appeared the caption, "JES [sic], SENOR, THE NAME IS PACO!" (Doc. 17-7).

Contrary to Plaintiff's characterization of the foregoing,[3] Defendant contends that its "work environment was replete with jokes and teasing" and that Mr. Fogg never demeaned or harassed Plaintiff (Doc. 17 at 3-4). Indeed, other employees, including Mr. Fogg, had nicknames of their own (Mr. Fogg was sometimes referred to as "Stretch or Carlito" and Defendant's Human Resources Manager, Shawn Vanbuskirk, was referred to as "Spanky"). Furthermore, on at least one occasion, Plaintiff used the nickname "Paco" to refer to himself in an email (Doc. 22-14 at 68-69). Concerning his other off-color remarks and the company calendar, Mr. Fogg testified that he did not find them inappropriate for the workplace because he did not think Plaintiff or anyone else was offended by them (Doc. 22-13 at 29).

Whether Mr. Fogg actually intended to demean or harass Plaintiff, or his comments were unwelcome, Plaintiff conceded during his deposition that he did not report or complain of any harassment or discrimination until the evening of May 21, 2008 – the day after he learned he had been asked to resign or that he would be terminated. At that time, Plaintiff sent an email to Defendant's Vice President of Human Resources, Steve Erdman, and to Defendant's Southeast Division President, Pete MacLean, in which he wrote:

---

[3]Plaintiff contends that Mr. Fogg's remarks and other conduct were demeaning and not intended to be humorous. In addition to his own deposition testimony concerning this issue, Plaintiff cites to the declaration of Dave Watson, one of the Defendant's Route Operations Managers and one of Plaintiff's subordinates during his tenure as an Area Manager. In his declaration, Mr. Watson swears that Mr. Fogg's repeated use of the name "Paco" to refer to Plaintiff was "belittling and derogatory" and never meant as a joke (Doc. 22-18, ¶ 12). Furthermore, Mr. Watson swears that Defendant's Human Resource Manager, Shawn Vansbuskirk, also frequently referred to Plaintiff as "Paco" and commonly referred to the Route Sales Representatives in Orlando as "being part of 'the Latino faction'" (Doc. 22-18, ¶ 15). The Court, as it must at this stage of the proceedings, construes these averments in the light most favorable to the Plaintiff.

. . . This note is asking for guidance from HR because this situation may be based on discrimination of my race, national origin and heritage. Over the past two years, during which I have report to Charles [Fogg], he has directed many inappropriate comments to me. For example, Charles refers to me as "Paco". [sic] Just last month, prior to a meeting in Orlando, Charles said "hey Paco shouldn't you be out in front of the branch trimming the hedges". [sic] Several colleagues were in the room at the time and can confirm the statement, which I found offensive and discriminatory. These are two of several examples that I have documented and am prepared to share with you.

Because of my position in the company and fear of retribution, I have not previously elevated this issue. It is clear to me now that Charles may lack confidence in my management and wants me to resign because he views my ethnic group as one confined to gardening . . .

(Doc. 17-8 at 82-83). Notwithstanding his knowledge of Defendant's harassment policy (Doc. 17-7 at 58, Doc. 17-8 at 54 and Doc. 22-14 at 14) and his senior management position, Plaintiff sent the foregoing email nearly two years after the harassment supposedly first began (Doc. 22-14 at 63).

In pertinent part, Defendant's harassment policy provides:

DS Waters is committed to maintaining a productive workplace environment free from harassment . . . We believe in treating everyone with fairness, dignity and respect, regardless of race, color, ancestry, national origin, sex, marital status, sexual orientation, age, religion, disability, military service or any other legally protected status.

The Company prohibits any discriminatory action and any unwelcome conduct or behavior that adversely affects a person because of his/her protected status. Examples of prohibited discriminatory conduct include, without limitation, racial epithets, slurs, negative stereotypes and the circulation or posting of written or graphic materials that show hostility or insensitivity toward persons because of their protected status . . .

If an Associate believes that he/she is being harassed by a Manager or Supervisor,[4] [or] a fellow Associate . . . [the] Associate should immediately report the harassment to their Manager or Supervisor or to their local Human Resources Representative. DS Waters will not reprimand, penalize or otherwise retaliate against an Associate for opposing or reporting alleged discrimination or harassment in violation of applicable laws or Company policies.

Any Manager or Supervisor who is aware of conduct by an Associate(s) that is inconsistent with this policy, or who receives a report of inappropriate conduct, must immediately inform his/her local Human Resources Representative. This policy does not require reporting harassment or discrimination to any person who is allegedly creating the harassment or discrimination . . .

DS Waters will promptly investigate all reports describing conduct that is inconsistent with this policy . . .

(Doc. 17-7 at 72-73).

## C. Plaintiff's Work Performance and Termination

Prior to Defendant's reorganization, Plaintiff received an "Exceeds Expectations" for overall performance on his 2005 performance review – the highest ranking (Doc. 17-8 at 39).[5] He also achieved 100% or better on three of the four objective metrics Defendant utilized during the

---

[4]"Associate," "Manager," and "Supervisor" appear to be defined terms within Defendant's Employee Handbook. Neither party, however, has included that portion of Defendant's Employee Handbook which defines these terms. It is not entirely clear, then, how Defendant's harassment policy applied to Plaintiff inasmuch as he was an "Area Manager" who was subject to harassment and Defendant's policy appears only to refer to harassment of "Associates" by their "Managers" or by their "Supervisors" or by other "Associates" – not the harassment of a "Manager" or "Supervisor" by another "Manager" or "Supervisor."

[5]Defendant's scale includes "Unacceptable," "Meets Some Expectations," "Meets Expectations," and "Exceeds Expectations" (Doc. 17-8 at 31 and 42). While a rating of "Exceeds Expectations" means the "Individual exceeds expectations . . . and frequently makes significant contributions well beyond job responsibilities," a rating of "Meets Expectations" means that the "Individual consistently meets expectations for this objective or competency. Employee knows and performs the job well, and may occasionally exceed expectations in some areas. Individual is fully competent and [a] valued employee" (Doc. 17-8 at 31 and 42).

2005 calendar year (Doc. 17-8 at 32-33).[6] While Plaintiff was reviewed at this time by his previous supervisor, Mark Foley, Mr. Foley noted to Plaintiff on his review that Mr. Fogg "is lucky to you get on the Operations Team. You are by far his strongest Manager. Keep pushing performance and be sure that you balance your life." (Doc. 17-8 at 37).

After Defendant's reorganization and Plaintiff's change in supervisors, Mr. Fogg rated Plaintiff a "Meets Expectations" for overall performance on Plaintiff's 2006 performance review (Doc. 17-8 at 50). Despite the decline in his overall performance, Plaintiff nevertheless achieved 100% or better on all of the objective metrics Defendant utilized during the 2006 calendar year.[7] In his approximately two-pages of written comments concerning Plaintiff, Mr. Fogg noted, *inter alia*:

> Kolin is highly motivated to win. He wants his team to achieve the highest levels and works very hard to achieve this. In 2006, Kolin struggled to get into the details as much as was needed. Part off this was due to the transition from a Sales Manager position and part due to his management style. In the beginning, I did not believe that Kolin was spending enough time analyzing his P&L, developing a plan, and holding his people accountable for the results. Kolin has been working on this lately and I have seen progress . . .

> Kolin needs to turn in assignments on time. There have been several occasions that he has missed deadlines. Sometimes this has been due to his people not being notified of the assignments and others have been due to his failure to follow up . . .

---

[6]These metrics included number of new customers, percentage of new customers at list price, percentage of customers that signed a 36-month agreement, and percentage of customers that signed up for recurring credit card charges (Doc. 17-8 at 32-33).

[7]In contrast to the 2005 metrics, Defendant's 2006 metrics included EBITDA, cooler rental customer base, "Front Line" EBITDA, budgeted revenue, and OPEX per unit (i.e., operating expenses per unit) (Doc. 17-8 at 43-44).

Kolin works well with his team and does a good job motivating his team. Kolin has worked hard to change the culture in his branches . . .

There has been a lot of change over the past year . . . We are not where we want to be yet but we are much better off now than 1 [sic] year ago. This is due to Kolin's leadership . . .

(Doc. 17-8 at 48-49).

Notwithstanding his 2005 and 2006 performance reviews, according to Defendant, Plaintiff's performance begin to significantly decline in 2007 (Doc. 17 at 6). Although Defendant apparently did not prepare a 2007 or 2008 performance review for Plaintiff,[8] Defendant contends that Plaintiff "missed deadlines, lacked attention to detail, and failed to properly plan" (Doc. 17 at 6). Specifically, Defendant notes that Mr. Fogg criticized Plaintiff for failing to relay enough substantive information and relied too much on humor in an important 2007 presentation to other managers and Defendant's East Division President (Doc. 22-14 at 42). While Plaintiff recalled that Mr. Fogg criticized him for the presentation and that he told Mr. Fogg that he "would refrain from doing that in the future," Plaintiff also felt that the criticism was simply Mr. Fogg's "opinion" (Doc. 22-14 at 42). Defendant also notes that Mr. Fogg spoke with Plaintiff about his failure to timely implement a safe driving course, known as "Smith training," for Defendant's Route Sales Representatives in mid to late 2007 (Doc. 22-14 at 48-49). Plaintiff conceded during his deposition that the "Smith training" was not completed on time (Doc. 22-14 at 49-50). Defendant further notes that Mr. Fogg criticized Plaintiff for causing a substantial delay in maintaining Defendant's computer management software, Maximo, which affected Defendant's

_____

[8]Neither party has addressed why Defendant did not prepare a 2007 or 2008 performance review for Plaintiff.

financial standing (Doc. 17 at 7). Plaintiff conceded that Mr. Fogg had been pressing him to make sure the system was updated on time, that he was responsible for ensuring that his subordinates updated the system, that the system was not updated on time, that some invoices from 2007 flowed into 2008, and that he could have done more to ensure that the system would have been timely updated (Doc. 22-14 at 43-44).

In light of these and other deficiencies, in January, 2008, Mr. Fogg asked Plaintiff to prepare a performance improvement plan to address "his lack of organizational skills, attention to details, coaching, and developing his employees, holding people accountable, and poor performance/productivity issues with his Sales Managers" (Doc. 17 at 8, citing 22-14 at 50-53). According to Mr. Fogg, however, Plaintiff failed to execute on his plan and in April, 2008, Mr. Fogg met with Plaintiff twice to discuss his "continued low productivity" and "poor performance" (Doc. 17 at 8, citing 22-13 at 15 and Doc. 17-6 at 56). By May, 2008, if not earlier, Plaintiff and Mr. Fogg were both aware that Plaintiff's job could be in jeopardy (Doc. 22-14 at 53 and Doc. 22-13 at 43). Furthermore, as early as May, 2007, Mr. Fogg began communicating his concerns about Plaintiff's performance problems to Defendant's Southeast Division President, Pete MacLean, (Doc. 22-15 at 14-15), and by mid-May, 2008, Defendant's Vice President of Human Resources, Steve Erdman, had also become aware of Plaintiff's performance issues (Doc. 22-17 at 27-28).

On May 15, 2008, Mr. Fogg met with approximately twenty of Defendant's Orlando employees, many of whom, if not all, were Plaintiff's subordinates, to discuss their concerns about Plaintiff's performance (Doc. 22-13 at 50).[9] According to Mr. Fogg's notes and his personal

---

[9]This meeting appears to have been called by Plaintiff's subordinates – not at the behest of Mr. Fogg – as Plaintiff's subordinates wanted to speak with Mr. Fogg outside of Plaintiff's presence (Doc.

recollection of that meeting, Plaintiff's subordinates were unhappy about Plaintiff's management. Specifically, they complained that Plaintiff "took criticism too personally, that he thrived on chaos and enjoyed conflict, that he view[ed] everything in terms of 'I' rather than as a team, and that he had personal issues with some of his subordinates" (Doc. 17 at 9-10, citing Doc. 17-4). Mr. Fogg testified that he came away from the meeting with the sense that what he had been told was certainly "not good" for Plaintiff and that, by this time, Plaintiff's job was in "serious jeopardy" (Doc. 22-13 at 50).

On May 16, 2008, Mr. Fogg placed Plaintiff on administrative leave to investigate the complaints he had received on May 15, 2008 (Doc. 22-13 at 52-53). Mr. Fogg then reviewed his notes from the May 15, 2008 meeting, reviewed Plaintiff's performance history, and spoke further with Mr. MacLean and Mr. Erdman (Doc. 22-13 at 53). On May 20, 2008, Mr. Fogg finally decided to terminate Plaintiff, citing "continued poor performance, management deficiencies, and low sales productivity" (Doc. 17 at 11, citing 22-13 at 50; *see also* Doc. 17-8 at 80).[10] Plaintiff's written termination, however, was dated May 22, 2008, with an effective termination date of May 21, 2008 (Doc. 17-8 at 80).[11]

---

22-9 at 2).

[10]Mr. Fogg apparently also gave Plaintiff the option to resign, but Plaintiff ultimately declined to do so and was thereafter officially terminated (Doc. 22-13 at 53 and Doc. 17-8 at 80).

[11]Prior to receiving his written termination letter, but after Mr. Fogg orally told Plaintiff that he was terminated, Plaintiff sent the May 21, 2008 email discussed, *supra*, in which he informed Mr. Erdman and Mr. MacLean that he believed he had been unlawfully discriminated against (Doc. 17-8 at 82-83). Upon receipt of that email, Defendant conducted an internal investigation regarding Plaintiff's complaints and ultimately concluded that Plaintiff had not been discriminated against. Plaintiff disputes both the manner in which Defendant's investigation was conducted and its conclusion, characterizing it as a whitewash (Doc. 22 at 22). Because the Court does not reach

## III. Standards of Review

### A. Summary Judgment

A party is entitled to summary judgment when it can show that there is no genuine issue as to any material fact. FED. R. CIV. P. 56(c); *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir. 1994). Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Watson v. Adecco Employment Servs., Inc.*, 252 F. Supp. 2d 1347, 1352 (M.D. Fla. 2003). A court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Hinson v. Clinch County, Ga. Bd. of Educ.*, 231 F.3d 821, 826-27 (11th Cir. 2000)(quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000)).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted). Thereafter, summary judgment is mandated against the non-moving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id*. at 322, 324-25; *Watson*, 252 F.Supp.2d at 1352. The party opposing a motion for summary judgment must rely on

---

Defendant's *Faragher* defense, *see Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), it does not address Defendant's internal investigation.

more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value"); *Broadway v. City of Montgomery, Ala.*, 530 F.2d 657, 660 (5th Cir. 1976).

## B. 42 U.S.C. § 1981

In pertinent part, 42 U.S.C. § 1981 ("§ 1981" or "Section 1981") provides:

(a) Statement of equal rights

All persons within . . . the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . .

(b) "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

42 U.S.C. § 1981.

Given the foregoing statutory text, any claim brought under § 1981 "must initially identify an impaired 'contractual relationship' . . . under which the plaintiff has rights." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006).[12] Once an impaired contractual relationship is

---

[12]While Plaintiff has not specifically identified his contractual relationship, Plaintiff was apparently an at-will employee of the Defendant (Doc. 17-7 at 71). Every Circuit Court of Appeal that has addressed the issue, has held that an at-will employment relationship constitutes a "contractual relationship" for purposes of stating a claim under § 1981. *See, e.g., Walker v. Abott Labs.*, 340 F.3d 471 (7th Cir. 2003); *Skinner v. Maritz, Inc.*, 253 F.3d 337 (8th Cir. 2001); *Lauture v. Int'l Bus. Mach.*, 216 F.3d 258 (2d Cir. 2000); *Perry v. Woodward*, 199 F.3d 1126 (10th Cir. 1999); *Spriggs v. Diamond Auto Glass*, 165 F.3d 1015 (4th Cir. 1999); *Fadeyi v. Planned Parenthood Ass'n of Lubbock, Inc.*, 160 F.3d 1048 (5th Cir. 1998); *see also Aquino v. Honda of Am., Inc.*, 158 F. App'x 667 (6th Cir. 2005) (unpublished). Neither the Eleventh Circuit nor the Supreme Court, however, have addressed this question. Although at least two district courts have held that at-will employment is a "contractual relationship" under Florida law for purposes of § 1981, *see McCabe v. Excel Hospitality, Inc.*, 294 F. Supp. 2d 1311 (M.D. Fla. 2003); *Knight v. Palm City Millwork and Supply Co.*, 78 F. Supp. 2d 1345 (S.D. Fla. 1999), this Court simply assumes, without deciding, that an at-will employment

-12-

identified, the standards for proving racially discriminatory treatment under § 1981 are the same as those governing claims brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-17 ("Title VII"). *Crawford v. Western Elec. Co., Inc.*, 745 F.2d 1373, 1376-77 (11th Cir. 1984).

## IV. Analysis

### A. Termination Claim

To establish his termination claim, Plaintiff must present proof of discriminatory intent through either direct or circumstantial evidence. *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000). "Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption." *Id.* (quoting *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998)). Only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination.[13] *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004) (citations omitted).

In a case where there is no direct evidence of discrimination, courts analyze whether summary judgment is appropriate under the familiar framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Dep't of Cmty. Affairs v. Barton*, 450 U.S. 248

---

relationship constitutes a "contractual relationship" for purposes of stating a claim under § 1981.

[13]Plaintiff does not contend in his Response that any of the evidence in this case constitutes direct evidence. The Court therefore concludes that Plaintiff's case is based only on circumstantial evidence.

(1981).  *See also Wilson*, 376 F.3d at 1087.  Under that framework, Plaintiff first bears the threshold burden of establishing a prima facie case of discrimination.  *Id.*

Generally, Plaintiff may establish a prima facie case of racial discrimination by showing that: (1) he belongs to a racial minority; (2) he was subjected to adverse employment action; (3) his employer treated similarly-situated employees outside his classification more favorably; and (4) he was qualified to do the job.  *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).  Failing that, Plaintiff must at least meet the threshold of establishing facts to support a reasonable inference of discriminatory intent.  *Id.* at 1562, 1564; *Wilson*, 376 F.3d at 1087, 1092.

If Plaintiff establishes a prima facie case, a rebuttable presumption of discrimination arises, and the burden of production shifts to Defendant to articulate a legitimate, non-discriminatory reason for its actions.  *Wilson*, 376 F.3d at 1087.  Defendant "need not persuade the court that it was actually motivated by the proffered reasons."  *Id.* (citation omitted).  If the proffered reason might motivate a reasonable employer, the presumption of discrimination is rebutted and the burden of production shifts back to the plaintiff.  *Id.*  Plaintiff must then meet any such proffered reason head on, rather than quarrel with its wisdom, and prove that it is a pretext – i.e., the proffered reason did not honestly motivate the employer.  *Id.*; *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (holding that, regardless of whether the proffered reason is unfair, heavy handed, or based on erroneous facts, the "inquiry is limited to whether the employer gave an honest explanation of its behavior.") (citations omitted); *see also Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1341 (11th Cir. 2001) (further noting that it is "not the court's role to second-guess the wisdom" or business judgment "of an employer's decisions as long as the decisions are not

racially motivated"), *overruled on other grounds by Manders v. Lee*, 338 F.3d 1304, 1328 (11th Cir. 2003).

For purposes of its Motion, Defendant concedes that Plaintiff has established a prima facie case of discrimination (Doc. 17 at 16). Defendant contends, however, that it had legitimate, non-discriminatory reasons for its decision to terminate Plaintiff and that Plaintiff cannot offer any evidence to rebut these non-discriminatory reasons (Doc. 17 at 15-16).

**1. Defendant's Proffered Reasons for Terminating Plaintiff**

Defendant claims that it terminated Plaintiff because of his continued poor performance, management deficiencies, and low sales productivity. Concerning Plaintiff's poor performance, Defendant relies on some of the general, conclusory concerns raised in Plaintiff's performance reviews (e.g., lack of organization and missing deadlines). With respect to Plaintiff's management deficiencies, however, Defendant provides more concrete examples: Plaintiff's inability to timely implement Defendant's safe driving course for its Route Sales Representatives and Plaintiff's failure to properly oversee the required updates to Defendant's Maximo computer system. Regarding Plaintiff's low sales productivity, Defendant notes that Plaintiff's subordinates began to miss their customer base requirements starting in 2007 and that sales continued to lag into 2008, notwithstanding the fact that Mr. Fogg had lowered Plaintiff's sales target to just 1.5 customers per day.

Plaintiff concedes, and the Court concludes, that Defendant has met its burden of rebutting Plaintiff's prima facie case (Doc. 22 at 4). Accordingly, the burden of production shifts back to Plaintiff and he must address Defendant's proffered reasons "head on" and show that those reasons did not honestly motivate Defendant to terminate him. *Wilson*, 376 F.3d at 1087-88.

## 2. Plaintiff's Evidence of Pretext

Plaintiff addresses Defendant's proffered reasons for his termination in three ways. First, Plaintiff argues that Mr. Fogg's May 15, 2008 meeting with Plaintiff's subordinates was only meant to offer cover for Fogg's subsequent termination decision and that Plaintiff's subordinates were not unhappy with his management (Doc. 22 at 17). Second, Plaintiff argues that prior to being placed on administrative leave, Mr. Fogg never told Plaintiff that he was being placed on leave for, *inter alia*, failing to show improvement on his "recovery" plan;[14] instead, Mr. Fogg apparently only told Plaintiff that he was being placed on administrative leave because of the comments Mr. Fogg had received in the May 15, 2008 meeting with Defendant's subordinates (Doc. 22 at 20). Finally, Plaintiff also appears to contend that he met his performance goals by earning virtually all of his bonuses in 2006 and 2007 (Doc. 22 at 13, noting, *inter alia*, that Plaintiff earned 75% of his 2007 bonus).

## 3. Conclusion Regarding Plaintiff's Termination Claim

Upon review, Plaintiff has failed to adduce sufficient evidence of pretext. Plaintiff's contentions regarding the May 15, 2008 meeting and his putative failure to execute on the recovery plan are of no moment. Irrespective of whether the May 15, 2008 meeting or the recovery plan actually entered into Defendant's termination decision,[15] Defendant's proffered reasons for

---

[14]While Plaintiff concedes that he may have had some performance problems in 2008, he nevertheless attacks the recovery plan in his Response as having simply been "engineered" by Mr. Fogg (Doc. 22 at 20). In his deposition, however, Plaintiff not only admitted that it was actually his job to draft the plan, but that the plan's goals – and at least some of Mr. Fogg's criticisms – were valid (Doc. 22-14 at 50-53).

[15]Defendant explicitly denies that Mr. Fogg's termination decision was based on his May 15, 2008 meeting with Plaintiff's subordinates (Doc. 17 at 11, n. 10).

terminating Plaintiff were much broader and included his poor performance as an Area Manager, his management deficiencies, and low sales productivity. While Plaintiff's evidence concerning his bonuses may cast some doubt on whether Defendant actually perceived Plaintiff to be a poor performer who had low sales productivity, Plaintiff's 2006 and 2007 bonuses have no bearing on his management deficiencies (including, e.g., his failure in 2008 to ensure that his subordinates timely implemented Defendant's safe driving course and continued to update Defendant's computer system). In short, Plaintiff has failed to rebut Defendant's legitimate reasons for his termination.

Whether Defendant's proffered reasons for terminating Plaintiff were sound or even based on erroneous facts, Plaintiff has failed to adduce sufficient evidence that would permit a reasonable factfinder to conclude that those reasons were not what actually motivated Defendant's termination decision. In the absence of such evidence, the Court will not second-guess Defendant's business judgment and infer discriminatory intent. Accordingly, Defendant is entitled to summary judgment on Plaintiff's termination claim.

### B. Hostile Work Environment Claim

To establish his hostile work environment claim, Plaintiff must show that: (1) he belongs to a protected group; (2) he has been subject to unwelcome harassment; (3) the harassment was based on a protected characteristic; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of his employment and create a discriminatorily abusive working environment; and (5) Defendant is responsible for such environment under either a theory of vicarious or direct liability. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (citing *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1244 (11th Cir. 1999)).

With respect to the severity of the conduct at issue, the Supreme Court has held that this element contains both an objective and a subjective component. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993). To be actionable, then, Plaintiff must show that the harassment resulted both in an environment "that a reasonable person would find hostile or abuse" and an environment that Plaintiff himself "subjectively perceive[d] . . . to be abusive." *Id.*; *see also Miller*, 277 F.3d at 1276 (quoting *Harris*).

In evaluating the objective component, the Court must consider: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997). Importantly, the Court should examine the conduct in context, not as isolated actions, and determine under the "totality of the circumstances" whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of Plaintiff's employment and create a hostile or abusive working environment. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999).

For purposes of its Motion, Defendant concedes that Plaintiff has established that he belongs to a protected group and that he was subjected to unwelcome harassment (Doc. 17 at 20). Nevertheless, Defendant contends that there no genuine issues of material fact with respect to the remaining three elements under *Miller*: that the harassment was based on a protected characteristic of the employee; that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment; and that the Defendant was responsible for the work environment under a theory of vicarious or direct liability. 277 F.3d at 1275. Finally, Defendant also contends that summary judgment is appropriate on Plaintiff's hostile working environment claim because it

has established, as a matter of law, that Plaintiff failed to complain about the harassment while he was employed (Doc. 17 at 20).

For purposes of its Order, the Court assumes that the harassment in this case was based on one or more of Plaintiff's protected characteristics and that Defendant was responsible for Plaintiff's work environment. Accordingly, the Court addresses the subjective and objective components concerning the severity of the harassment at issue, *infra*.

### 1. Plaintiff's Work Environment May Have Been Subjectively Hostile

As a threshold matter, it is a close question whether Plaintiff even subjectively perceived his work environment to be abusive. While Plaintiff certainly testified that he felt his work environment was abusive and that he was repeatedly subjected to demeaning comments from his immediate supervisor in presence of other employees, Plaintiff waited nearly two years after the harassment first began – and after he was terminated or at least knew that he would immediately be terminated – to report any inappropriate conduct. Notwithstanding his apparent fear of retaliation, Plaintiff was a senior manager in charge of one-third of Defendant's Florida business and clearly had (or at least should have had) a familiarity with Defendant's harassment policies. Furthermore, on at least one occasion Plaintiff used the nickname "Paco" to refer to himself in an email and also appears to have used some of the other office nicknames to refer to his colleagues.

On the other hand, Plaintiff corroborates the subjective component with the declaration of Mr. Watson, who swore, *inter alia*, that Mr. Fogg's remarks and use of the nickname "Paco" were not humorous and clearly were belittling and derogatory. Although Mr. Watson's perception of the conduct at issue does not directly support a finding that *Plaintiff* perceived his environment to

be abusive, Mr. Watson's averments arguably provide some additional support for Plaintiff's conclusory testimony.

On balance, while Plaintiff's evidence concerning the subjective component is weak, the Court is compelled at this stage of the proceedings to draw all reasonable inferences in favor of Plaintiff. Accordingly, the Court concludes that Plaintiff is entitled to have a jury decide whether he subjectively perceived his work environment to be hostile or abusive.

### 2. Plaintiff's Work Environment Was Not Objectively Hostile

Plaintiff has failed to carry his burden of producing sufficient evidence on the objective component. First, only some of the conduct in this case was arguably frequent. *Allen*, 121 F.3d at 647. Second, none of the conduct was "physically threatening" or "humiliating." *Id.* Third, in comparison to other hostile work environment cases, none of the conduct in this case was particularly severe. *Id.* Finally, Plaintiff has not produced sufficient evidence demonstrating that the conduct unreasonably interfered with his job performance. *Id.* The Court address these factors, *infra*.[16]

### a. Frequency of the Conduct

Only a portion of the conduct at issue in this case appears to have been frequent. Indeed, Plaintiff has identified only five or six incidents where Mr. Fogg made inappropriate remarks that could have been based on Plaintiff's racial or ethnic characteristics (e.g., telling Plaintiff, "Hey Paco, shouldn't you be out in front of the branch trimming the hedges," telling Plaintiff, "why is that [trash can] out there, aren't you the janitor here," telling Plaintiff, "Your last name is Garcia,

---

[16] Because the Court concludes that none of the conduct in this case was "physically threatening" or "humiliating," this factor does not warrant further discussion.

shouldn't you be able to start it without the keys," and forwarding the "Labor market in 2009" email to Plaintiff and other employees). The only frequent conduct appears to have been Mr. Fogg's (and to a lesser extent, apparently Mr. Vansbuskirk's) use of the moniker "Paco," and the calendar which included a picture of Plaintiff wearing a straw with a caption, "JES [sic], SENOR, THE NAME IS PACO!" Even this conduct, however, does not appear to have been terribly frequent. Indeed, according to Plaintiff, Mr. Fogg's use of "Paco" occurred, at most, only a few times per week (Doc. 22 at 2).[17] Furthermore, assuming Mr. Fogg actually used the employee calendar for its intended use, Plaintiff's picture would have been on display, in Mr. Fogg's office, for less than five percent of the entire time that Plaintiff complains he was harassed.[18]

### b. Severity of the Conduct

In comparison to other cases within the Eleventh Circuit, the severity of the conduct in this case falls well-short of a hostile work environment. *See*, *e.g.*, *Barrow v. Ga. Pac. Corp.*, 144 Fed. App'x 54, 57 (11th Cir. 2005) (unpublished) (finding no hostile work environment even when the employee's supervisor called him "nigger" three times in one year, repeatedly called him "boy," told him two or three times he was going to kick his "black ass," threatened to cut him for looking at a white girl, and another supervisor called employee "black boy"); *Miller*, 277 F.3d 1269 (upholding district court's denial of a motion for a judgment as a matter of law after jury returned verdict in favor of plaintiff and finding sufficient evidence of a hostile work environment where

---

[17]Plaintiff does not identify in his Response the frequency of Mr. Vansbuskirk's use of the name "Paco."

[18]Because Plaintiff's picture was only associated with May, 2008 (Doc. 22-8 at 11-12), it would have been on display for only a single month out of the nearly twenty-four months that Plaintiff complains he was harassed. One divided by twenty-four equals approximately .04166.

supervisors and others called employee "wetback," "spic," and "Mexican motherfucker" on a daily

basis); *Streeter v. City of Pensacola*, Case No. 05-CV-286, 2009 WL 248103 (N.D. Fla. 2009)

(finding no hostile work environment notwithstanding infrequent use of racial epithets such as

"nigger," "nigglets," the acronym "DAN" for "dumb ass nigger," and the presence of nooses and

other employees wearing white sheets in the workplace); *Perez v. Pavex Corp.*, Case No. 01-CV-

69, 2008 WL 348803 (M.D. Fla. 2008) (finding hostile work environment where employee was

repeatedly called "spic" and "fucking Cuban" and the harassment continued notwithstanding

employee's repeated complaints to management); *Casanova v. Pre Solutions, Inc.*, Case No. 04-

CV-2053, 2006 WL 5451193 (N.D. Ga. 2006) (finding no hostile work environment where

supervisor frequently referred to employee as "Carlos" and "Julio," once stated, "were you guys

having some sort of fiesta at the Company's expense?", "you people can't add," and once called

employee a "fat wetback" in front of other employees).

### c. Extent to Which the Conduct Interfered With Plaintiff's Job Performance

Plaintiff has not demonstrated that the conduct at issue in this case unreasonably interfered

with his job performance. Indeed, Plaintiff has offered no evidence regarding the extent to which

being called "Paco" and being caricatured in his boss' calendar, as well as all of the other

inappropriate conduct in this case, interfered with this job performance. Although Plaintiff

contends that the inappropriate conduct undermined his authority to manage his subordinates, he

offers no evidence – other than his own conclusory testimony – to support that contention.[19]

---

[19]Even assuming that Plaintiff's own testimony clearly established that the harassment to which he was subjected undermined his authority to manage his subordinates and be an effective manager, the gravamen of Plaintiff's entire Response is that he continued to meet his performance goals and was an excellent manager (*see*, *e.g.*, Doc. 22 at 12-13).

Furthermore, Plaintiff does not even suggest in his Response that he was emotionally damaged, or that he manifested any physical symptoms of emotional distress, as a result of any of the conduct in this case.

### 3. Conclusion Regarding Plaintiff's Hostile Work Environment Claim

Based on the totality of the circumstances in this case, the Court concludes that Plaintiff has failed to show that a genuine issue of material fact exists as to whether his workplace was so "permeated with discriminatory intimidation, ridicule, and insult" as to alter the conditions of his employment. *Miller*, 277 F.3d at 1275. Accordingly, Defendant is entitled to summary judgment on Plaintiff's hostile work environment claim.

## V. Conclusion

For the foregoing reasons, Defendant DS Waters of America, Inc.'s Motion for Summary Judgement (Doc. 17) is **GRANTED**. The Clerk of the Court is directed to enter a judgment in favor of the Defendant and against the Plaintiff on all claims in the Complaint and to close the case.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on July 28, 2009.

Copies furnished to:

Counsel of Record
Unrepresented Party

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

-23-